BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
RAYMOND E. PATRICCO, WASHINGTON, D.C. BAR NO. 454792
JUSTIN D. WHATCOTT, IDAHO STATE BAR NO. 6444
JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARK A. ELLISON<br><br>Defendant. | Case No. 1:13-cr-00091-BLW<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE** |

The United States of America, by and through Bart M. Davis, United States Attorney,

and the undersigned Assistant United States Attorney for the District of Idaho, hereby objects to

Defendant's Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A).

The Defendant is a 71 year-old former triathlete.  In prison, he runs three miles three

times a week, exercises six times a week, and has a resting pulse of approximately 50.  He has

age-appropriate medical conditions:  Stage 3 kidney disease, high blood pressure, high

cholesterol, an underactive thyroid, mild anemia, ankle swelling, and a cough.  Currently, he is

serving his 60-month prison term in Federal Correctional Institution at Sheridan, Oregon ("FCI

Sheridan").  For the duration of the pandemic, FCI Sheridan has not reported a single COVID-19

case.  Against that backdrop, he has filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

In his motion, the Defendant paints a grim picture of his medical condition and prognosis at FCI Sheridan during the COVID-19 pandemic.  He requests compassionate release "before it is too late."  His description of his medical condition is based on the letters and medical opinions of two doctors commissioned by the Defendant's two sets of attorneys.  These doctors are the Defendant's daughter and his close family friend/neighbor.[1]  Neither have examined the Defendant since his incarceration.  Neither have reviewed his most recent Bureau of Prisons ("BOP") medical records.  Neither have stepped foot inside FCI Sheridan proper.  Yet, both have opined in no uncertain terms that the prison is unsafe and that the Defendant will die there unless released.  The Court should view these letters and opinions with healthy skepticism.

Even accepting these letters and opinions at face value, the Defendant's motion fails because the medical conditions his doctors describe do not meet the legal criteria for compassionate release.  The Centers for Disease Control ("CDC") does not recognize any of the medical conditions cited by the Defendant's doctors as placing him in the high risk category for contracting a severe case of COVID-19.  And according to contemporaneous BOP medical records, these conditions have not seriously deteriorated during Defendant's incarceration.  Indeed, according to the most recent BOP medical records – that post-date his doctors' letters and opinions – his kidney function has plateaued, his blood pressure, cholesterol, thyroid activity, and blood count are all within normal limits, and his ankle swelling and cough have subsided.  Thus, notwithstanding his advanced age, he cannot demonstrate an "extraordinary and compelling" reason for his compassionate release.  *Id.*

---

[1] Dr. Santina Ellison Keller is the Defendant's daughter.  Def. Mot. at 15, n.42.  Dr. Ann Huntington is a "close family friend[]" and neighbor.  Nevin Dec., App. A at 1 (Huntington Dec. 16, 2019 letter).

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 2

Even if he could demonstrate an "extraordinary and compelling" reason, the Section 3553(a) analysis would preclude his release.  18 U.S.C. § 3553(a).  At sentencing, the Defendant faced a guidelines range of 188 to 235 months for his involvement in the largest fraud in the history of the District of Idaho.  This Court departed significantly and sentenced the Defendant to 60 months.  This Court described its sentence as the "shortest sentence that I could pronounce and still effectuate the objectives of 3553(a)(2)."  Gov't Ex. B at 73.  The Defendant has served only approximately 22 months of this sentence.  Releasing the Defendant – an accountant and the former General Counsel for DBSI, who oversaw the drafting of the false investment disclosure materials that were the vehicle of the fraud – before he serves his full sentence would severely undermine the goals of just punishment and general deterrence.  Accordingly, the Section 3553(a) calculus weighs strongly against his release.

Finally, in these unprecedented times, the Government recognizes Section 3582 is a vital tool for the courts to help keep inmates and prison staff, and ultimately the community, safe. Section 3582 also serves an important gatekeeping function.  Adherence to its criteria (and the criteria of U.S.S.G. § 1B1.13) assures that the most vulnerable are released while the less vulnerable are not granted a windfall.  Stripped of the emotion of his motion, the Defendant has not shown he is one of the most vulnerable.  The Court should deny his motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Defendant's Crime and Sentence

The Defendant was a certified public accountant and General Counsel for the DBSI group of companies during the execution of the largest fraud in the history of Idaho.  *See generally* Gov't Sent. Mem. (ECF #682, Aug. 13, 2014).  As General Counsel, the Defendant played a critical role in deceiving DBSI investors, and DBSI employees, by creating, approving,

and disseminating false and fraudulent disclosure materials.  These materials falsely represented that DBSI was a successful and profitable company that could meet its future financial obligations to its investors.  In reality, as the Defendant well knew, DBSI had been and was collapsing, having been dependent for years on the sale of new investments to repay old investors.

Inside DBSI, the Defendant did more than just passively abdicate his role as General Counsel and answer to CEO Douglas Swenson.  He actively misled DBSI employees about the state of the company, including the National Sales Director, Merriah Harkins, who routinely probed him for the truth.  It took Matthew Duckett, a DBSI accountant and non-lawyer, to twice advise the Defendant of the threat of criminal prosecution before the Defendant took any decisive action.  On the eve of DBSI's collapse, the Defendant authorized more accurate disclosures in a few private placement memoranda.  But it was far too little and far too late. Investors had already lost over $100 million.

As a result of his conduct, on May 17, 2013, a federal grand jury returned a superseding indictment charging the Defendant with one count of conspiracy to commit securities fraud, wire fraud and mail fraud, one count of conspiracy to commit money laundering, 44 counts of securities fraud, and 34 counts of wire fraud.  (ECF #21).  On February 3, 2014, the Defendant proceeded to trial.  (ECF #329).  After 45 trial days, on April 14, 2014, the jury found the Defendant guilty of 44 counts of securities fraud.  (ECF #501).

On August 13, 2014, the Court sentenced the Defendant to 60 months in prison, to be followed by 3 years of supervised release, and a special assessment of $4,400.  (ECF #724).  On November 17, 2014, the Court ordered the Defendant to pay restitution of $32,158,501 to the victims of his counts of conviction.  (ECF #816).

Shortly after sentencing, on September 6, 2014, the Defendant moved this Court for release pending appeal. (ECF #745). This Court denied his motion. (ECF #759). However, on November 13, 2014, the Ninth Circuit granted the Defendant's motion. (ECF #813). As a result, Defendant remained free until his appeals were exhausted and he reported to prison on July 10, 2018. (ECF #974).

### B.      Defendant's Incarceration and Projected Release Date

On July 10, 2018, the Defendant entered federal custody. Defendant is currently serving his sentence at FCI Sheridan. The Defendant's projected release date is October 11, 2022. To date, he has served approximately 22 months of his 60-month sentence.

### C.      Defendant's Medical History

#### 1.      Defendant's Condition at Sentencing

In his June 2014 pre-sentence interview with the Probation Officer, the Defendant reported no history of serious health problems:

> The defendant described himself to be in good physical condition, having no history of serious or chronic health problems. The defendant maintains an active physical fitness routine, including participation in triathlons and mountain biking. The defendant reported suffering from high blood pressure, high cholesterol and low testosterone. The defendant is prescribed Metoprolol to address his high blood pressure; Pravastatin for high cholesterol; and a testosterone replacement therapy, administered every two weeks.

PSIR at ¶ 146 (ECF #676).

#### 2.      Defendant's Medical Condition at BOP

Upon his transport to FCI Sheridan, on July 17, 2018, the Defendant reported his medical conditions to the U.S. Marshals as follows: advanced age, hyperlipidemia (high cholesterol), hypertension (high blood pressure), and hypothyroidism (underactive thyroid). Gov't Ex. A at 84 (BOP Medical Records). The Defendant reported his medications as follows: Levothyroxine

(thyroid medication), Pravastatin (cholesterol medication), Lisonopril (blood pressure medication), and Excedrin (pain medication).  *Id.*

At FCI Sheridan, clinicians have examined, lab tested, and treated the Defendant for the following medical conditions:

        a.    <u>Chronic Kidney Disease</u>[2]

On September 20, 2018, the Defendant provided a urine sample that was lab tested.  *Id.*at 60.  His GFR was 51, placing him in Stage 3a.  *Id*.  His Albumin was 4.3, within normal limits of 3.5 to 5.0.  *Id.*

On October 4, 2018, the Defendant provided a urine sample that was lab tested.  *Id.*at 56. His Albumin was within normal limits and negative for blood in the urine.  *Id.*

On July 18, 2019, the Defendant provided a urine sample that was lab tested.  *Id.* at 166. His GFR was 53, placing him in Stage 3a.  *Id*.  His Albumin was 4.3, within normal limits of 3.5 to 5.0.  *Id.*

On August 15, 2019, the Defendant provided a urine sample that was lab tested.  *Id.* at 164.  His GFR was 51, placing him in Stage 3a.  *Id*.

---

[2] According to the National Kidney foundation, chronic kidney disease (CKD) is a condition characterized by a gradual loss of kidney function over time.  https://www.kidney.org/atoz/content/about-chronic-kidney-disease. Kidney function is measured in six stages – 1, 2, 3a, 3b, 4 and 5.  *Id.*  The stage is primarily determined by measuring eGFR (estimated glomerular filtration rate), which is tested by urine sample. https://www.kidney.org/ atoz/content/gfr.  Higher GFR readings indicate greater kidney function: A GFR of between 45 to 59 corresponds to Stage 3a of CKD which is described as "mild to moderate loss of kidney function."  Id.  A GFR of between 30 to 44 corresponds to Stage 3b of CKD which is described as "moderate to severe loss of kidney function."  Id.
    Further, urine samples test for blood or Albumin (a type of protein) in the urine.  Id.  When a patient has albumin in his urine it is called albuminuria.  Id.  People with a high amount of albumin in their urine are at an increased risk of having chronic kidney disease progress to kidney failure.  Id.  There are three categories of albuminuria: A1 (normal to mildly increased: <30mg/g), A2 (moderately increased: 30-299 mg/g), and A3 (severely increased: >300mg/g).  Id.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 6

On October 10, 2019, the Defendant provided a urine sample that was lab tested.  *Id.* at 159.  His GFR was 45, placing him at the highest-end of Stage 3a.  *Id.*  His Albumin was 4.7, within normal limits of 3.5 to 5.0.  *Id.*

On November 21, 2019, the Defendant provided a urine sample that was lab tested.  *Id.* at 155.  His GFR was 44, placing him at the lowest-end of Stage 3b.  *Id.*  His Albumin was 4.7, within normal limits of 3.5 to 5.0.  *Id.*

On December 6, 2019, the Defendant met with his clinician.  She "recommended he watch his protein intake and to not exceed 60g/[day]."  *Id.* at 103.

On January 9, 2020, the Defendant met with his clinician.  She discussed his "slow decline" of his GFR and recommended changes to his diet and water consumption to address.  *Id.* at 100.

On January 16, 2020, the Defendant provided a urine sample that was lab tested.  *Id.* at 152.  His GFR was 42, placing him at the low-end of Stage 3b.  *Id.*  His Albumin was 4.6, within normal limits of 3.5 to 5.2.  *Id.*

On February 27, 2020, the Defendant provided a urine sample that was lab tested.  *Id.* at 144.  His GFR was 43, an improvement over the month before, placing him at the low-end of Stage 3b.  *Id.*  His Albumin was 4.3, an improvement over the month before, and within normal limits of 3.5 to 5.2.  *Id.*[3]

On March 3, 2020, the Defendant met with a clinician.  *Id.* at 88-92.  Regarding his kidney function, the clinician wrote: "Inmate being personally monitored for trending down Cr

---

[3] On February 27, 2020, the Defendant met with a clinician for a follow up consultation.  *Id.* at 94. Regarding Defendant's kidney function, the clinician wrote: The Defendant "exercises regularly by running and doing burpees.  He used to frequently participate in triathalons.  Unclear if this exercise is falsely increasing his SCr (Serum creatinine)."  She also wrote that it was "unclear what the etiology is" for the slow decline in kidney function over the past year.  *Id.*  However, she did not have the results of the February 27, 2020 lab test that showed minor improvement.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 7

and eGFR levels. . . demonstrating some stability since Oct 2019." *Id.* at 88. "Inmate presents

today to review his most recent lab results for his kidneys.  No complaints at this time. . . PA to

order kidney ultrasound, requested appointment be scheduled for inmate with facility provider."

*Id.* at 91.

b.    Hypertension/Hyperlipedemia[4]

On September 13, 2018, the Defendant had his blood pressure tested and met with a

clinician.  *Id.* at 13. According to the clinician: Defendant "reports taking medications without

apparent side effects. . . BP normalized today. . .." *Id.*

On September 20, 2018, the Defendant had a blood test.  *Id.* at 60.  His total cholesterol

was 212 (above the normal limits of 50 to 200), his HDL was 44 (within normal limits of 40 to

60), his LDL was 149 (above normal limits of 0 to 130), and his triglycerides was 97 (within

normal limits of <150).  *Id.*

On June 13, 2019, the Defendant's blood pressure was 105/62, well within the normal

range.  *Id.* at 118.

---

[4] According to the American Heart Association, hypertension, or high blood pressure, is when the force of blood flowing through blood vessels is consistently too high.  *See* https://www.heart.org/en/health-topics/high-blood-pressure.  There are two numbers that are the measure of blood pressure: systolic (upper number) and diastolic.  *Id.*[4]  There are five categories of blood pressure: normal (systolic <120 and diastolic <80); elevated (systolic 120-129 and diastolic <80); high stage 1 (systolic 130-139 or diastolic 80-89); high stage 2 (systolic >140 or diastolic >90); hypertensive crisis (systolic >180 and/or diastolic >120).  *Id.*  High blood pressure can be managed with a low salt diet, exercise, and medication (Defendant has taken Lisinopril and Hydrocholorthiazide).
Further, according to the American Heart Association, cholesterol circulates in the bloodstream, and high levels can clog blood vessels and cause heart attack and stroke.  https://www.heart.org/en/health-topics/cholesterol/about-cholesterol.  There are two types of cholesterol: LDL cholesterol, which is bad, and HDL, which is good.  *Id.* Triglycerides are the chemical form of fat in the body.  https://www.heart.org/en/health-topics/cholesterol/about-cholesterol/what-your-cholesterol-levels-mean.  Hyperlipidemia is abnormally high levels of cholesterol and triglycerides.  Blood tests measure the amount of total cholesterol, HDL, LDL, and triglycerides in the bloodstream. Normal levels are approximately: total cholesterol (50 to 200); HDL (40 to 60); LDL (0 to 130); and triglycerides (less than 150).  *See* https://www.mayoclinic.org/diseases-conditions/high-blood-cholesterol/diagnosis-treatment/drc-20350806.  High cholesterol is treated with diet and medication (Defendant takes Pravastatin and Crestor).

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 8

On August 16, 2019, the Defendant met with his clinician.  *Id.* at 112.  Regarding Defendant's blood pressure, the clinician wrote:  "Takes HCTZ (hydrochlorothiazide) and Lisinopril.  No complaints.  No diziness."  *Id.*  The Defendant's blood pressure was 103/62, well within the normal range.  *Id.* at 118.

On October 2, 2019, the Defendant met with his clinician.  *Id.* at 110.  According to his clinician: "Inmates blood pressure is well controlled at 115/58. . . Inmate reports exercising daily [] running and pushups. . .."  *Id.*

On November 14, 2019, the Defendant met with his clinician.  *Id.* at 105-06.  The Defendant's blood pressure was 125/72, well within the normal range.  *Id.* at 105.

On December 6, 2019, the Defendant met with his clinician.  *Id.* at 103.  According to his clinician: "Inmate reports compliance with his medications. . . Blood pressure is well controlled today at 108/56 (goal <140/90)." *Id.*  "Has a excellent workout regimen.  Running 2-3 days/week.  Pullups pushups, burpees, should workout from shoulder surgery, yoga, abs.  45-60min 5-6 days/week." *Id.*

On December 15, 2019, the Defendant's blood pressure was 140/80, at the high stage 2 range.  *Id.* at 118.

On December 25, 2019, the Defendant's blood pressure was 151/72, at the high stage 2 range.  *Id.* at 118.

On December 30, 2019, the Defendant's blood pressure was 105/57, returning to the normal range.  *Id.* at 118.

On January 9, 2020, the Defendant met with his clinician.  *Id.* at 100.  According to his clinician: "His BP is labile.  Sometimes is very elevated and other times is very low.  Likely due to age. . . Today his BP is good at 121/59 (goal<130/80)." *Id.*  "Discussed in great detail his

health.  He has a fear of debilitating issues such as MI [heart attack]/stroke.  He is an athlete.

Discussed not overdoing it during his exercising. . . He reports his heart rate is 120 when he

exercises which I explained was very good." *Id.*

On January 16, 2020, the Defendant had a blood test.  *Id.* at 147.  His total cholesterol

was 153 (within normal limits of 50 to 200), his HDL was 41 (within normal limits of 40 to 60),

his LDL was 97 (within normal limits of 0 to 130), and his triglycerides were 77 (within normal

limits of <150).  *Id.*

On February 27, 2020, the Defendant met with his clinician.  *Id.* at 94.  According to his

clinician: "Inmates BP is right at his goal of 130/80 at 131/65." *Id.*

On April 28, 2020, the Defendant met with a clinician.  *Id.* at 85-86.  The Defendant

reported pain (tender) near his ribs.  *Id.* at 85.  His blood pressure tested at 140/60.  *Id.* at 85.  He

was prescribed over-the-counter pain medication, hot compress, and rest.  *Id.*

   c.  Hypothyroidism/Edema[5]

On October 31, 2018, the Defendant's clinician reviewed his chart.  *Id.* at 12.  The

clinician observed that Defendant's TSH level was 3.43 (within normal limits).  *Id.*

On August 16, 2019, the Defendant met with his clinician.  *Id.* at 112.  The clinician

observed: "Takes pravastatin 20mg.  No complaints.  Labs look good. . . Takes 125mg of thyroid

---

[5] According to the American Thyroid Association, hypothyroidism is an underactive thyroid gland that produces lower amounts of the thyroid hormone.  https://www.thyroid.org/hypothyroidism/.  There are two blood tests that are used in the diagnosis of hypothyroidism: TSH (thyroid-stimulating hormone) test and T4 test.  *Id.*  The TSH test is the most important and sensitive test for hypothyroidism.  *Id.*  It measures how much of the thyroid hormone thyroxine (T4) the thyroid gland is being asked to make.  *Id.*  An abnormally high TSH means hypothyroidism: the thyroid gland is being asked to make more T4 because there isn't enough T4 in the blood.  *Id.*  According to the American Thyroid Association, normal TSH levels are between 0.4 and 4 mIU/L.  https://www.thyroid.org/patient-thyroid-information/ct-for-patients/january-2020/vol-13-issue-1-p-5-6/.  "In almost every patient, hypothyroidism can be completely controlled."  https://www.thyroid.org/hypothyroidism/.  It is treated with thyroxine (T4) replacement medication (Defendant takes Levothyroxine).

  Edema is the swelling of body tissue.  "Pitting" edema is where the affected area "pits" or leaves an indentation when touched.  *See* https://www.healthline.com/non-pitting-edema#diagnosis.  Non-pitting edema does not "pit" or leave an indentation when touched.  *Id.*  Chronic pitting edema is often a sign of liver, heart, or kidney problems.  *Id.*  Non-pitting edema is often a sign of a condition affecting the thyroid or lymphatic system.  *Id.*

replacement.  Last TSH was 0.06 [below normal limits]."  *Id.*[6]  The clinician also observed "pitting edema."  *Id.* at 113.

On November 14, 2019, the Defendant met with his clinician.  *Id.* at 105-06.  The clinician observed: "bilateral ankles have minor nonpitting edema."  *Id.* at 106.

On December 6, 2019, the Defendant met with his clinician.  *Id.* at 103.  According to his clinician: "He does have some pitting edema +2 in his ankles.  He sits during his job in the computer lab.  Recommended he not be sedentary and get up every 15 min or so."  *Id.*

On February 27, 2020, the Defendant met with his clinician.  *Id.* at 94.  According to his clinician: the Defendant had "swelling in both ankles.  He has HTN [hypertension], BPH [benign prostatic hyperplasia (enlarged protstate)], HLD [hyperlipidemia] and hypothyroidism."  *Id.* at 95.

On April 28, 2020, the Defendant met with a clinician.  *Id.* at 85-86.  The Defendant reported pain (tender) near his ribs.  *Id.* at 85.  The clinician observed "no swelling in ankles."  *Id.* at 86.

            d.        <u>Anemia</u>[7]

On September 20, 2018, the Defendant had a blood test.  *Id.* at 60-61.  His hemoglobin level was 13.8, within the normal limits of 12 to 17.5.  *Id.* at 60.  His hematocrit level was 42.2, within the normal limits of 38.8 to 50.  *Id.* at 61.

---

[6] On October 2, 2019, the Defendant met with a clinician.  *Id.* at 110:  As to this low TSH reading, the clinician wrote: "Inmates TSH is scheduled to be drawn soon.  Last level in August was low.  He had started Fe (iron supplement) around the same time but was taking it with levothyroxine.  There is a drug interaction there which would lower the amount of levothyroxine."  *Id.*

[7] According to the Mayo Clinic, Anemia is condition in which the patient lacks enough healthy blood cells to carry adequate oxygen to the body's tissues.  https://www.mayoclinic.org/diseases-conditions/anemia/symptoms-causes/syc-20351360.  To test for anemia, clinicians perform a complete blood count (CBC) to determine the levels of red blood cells contained in the blood (heratocrit) and the levels of hemoglobin.  https://www.mayoclinic.org/diseases-conditions/anemia/symptoms-causes/syc-20351360.  A low level of each is a sign of anemia.  *Id.*  Generic anemia is treated with changed diet and iron supplements (Defendant takes Ferrous Gluconate tablets).

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 11

On July 18, 2019, the Defendant had a blood test.  *Id.* at 166.  His hemoglobin level was 11.6, slightly below the normal limits of 12 to 17.5.  *Id.*  His hematocrit level was 35.3, slightly below the normal limits of 38.8 to 50.

On October 10, 2019, the Defendant had a blood test.  *Id.* at 159.  His hemoglobin level was 11.6, slightly below the normal limits of 12 to 17.5.  *Id.*  His hematocrit level was 35.2, slightly below the normal limits of 38.8 to 50.

On November 21, 2019, the Defendant had a blood test.  *Id.* at 155.  His hemoglobin level was 14.1, within the normal limits of 12 to 17.5.  *Id.*  His hematocrit level was 42.4, within the normal limits of 38.8 to 50.  *Id.*

On January 16, 2020, the Defendant had a blood test.  *Id.* at 152.  His hemoglobin level was 15.6, within the normal limits of 12 to 17.5.  *Id.*  His hematocrit level was 46.3, within the normal limits of 38.8 to 50.  *Id.*[8]

D.      **BOP's Action Plan**

From the start of the COVID-19 pandemic, the BOP has recognized the very significant threat that the virus poses to the health of its staff and inmates, and has taken proactive steps to prevent its spread in BOP facilities.  Indeed, the BOP foresaw the possibility of pandemic and has had a "Pandemic Influenza Plan" in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/ pan_flu_module_1.pdf.  The plan addresses social

---

[8] In addition to the above medical conditions, Defendant takes medication for an enlarged prostate (Tamsulosin) and low testosterone (testosterone injections).  These conditions are well controlled.  Further, on August 16, 2019, the Defendant was examined and reported a cough.  *Id.* at 112.  But the cough subsided and no longer appears to be a problem.  *See id.*at 85-86 (April 24, 2020 clinical encounter; pulmonary function clear, no mention of cough); *id.* at 42 (as of May 14, 2020, no reference to cough in list of Defendant's medical conditions).

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 12

distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Beginning in January 2020, the BOP activated that Action Plan as it relates to COVID-19.  Specifically, to prevent the spread of COVID-19 in BOP facilities, the action plan involves: (i) screening all new inmates for COVID-19 exposure risk factors and symptoms; (ii) quarantining asymptomatic new inmates with exposure risk factors for 14 days; (iii) isolating and testing symptomatic new inmates until they test negative for COVID-19; (iv) quarantining existing inmates for at least 14 days in their cells/quarters; (v) maximizing social distancing and staggering meal and recreation times to prevent larger gatherings; (vi) providing face masks to staff and inmates; (vii) suspending social and legal inmate visits between March 13 and May 18, 2020; (viii) cancelling staff travel and training; (ix) restricting contractor access to BOP facilities and requiring advanced health screening for essential contractors, including temperature monitoring; and (x) requiring enhanced health screening of staff, including temperature monitoring.  *See* www.bop.gov/coronavirus/index.jsp.

So far, the BOP's extraordinary preventative measures have proven very successful at the Defendant's correctional facility, FCI Sheridan.  As of May 27, 2020, FCI Sheridan has no reported cases of COVID-19 for inmates or staff.  *See* https://www.bop.gov/coronavirus/.

### E.   BOP's Prioritization of Home Confinement and the Defendant's Pending Request

In response to the COVID-19 pandemic, Congress passed the CARES Act which, in part, granted the BOP the authority to lengthen the maximum amount of time for which it is authorized to place a prisoner in home confinement under 18 U.S.C. § 3624(c).  Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27, 2020).  Further, on March 26, 2020, the Attorney General directed the BOP to

prioritize home confinement for eligible inmates for whom home confinement might be more effective in minimizing the risks of COVID-19.  Off. of the Att'y Gen., Mem. for Dir. of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020) at https://www.justice.gov/coronavirus.  The BOP is actively implementing and following the directive.

By his attorney's April 10, 2020 letter to the warden of FCI Sheridan, the Defendant made a specific request for home confinement pursuant to the Attorney General's directive.  *See* Nevin. Dec., Ex. A at 1.  The Government has confirmed that the BOP's Western Regional RRM office currently is considering Defendant's request, and if granted, the target date for the Defendant's release to home confinement is June 30, 2020.

## II.     LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

A district court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010). Compassionate release is one of the few exceptions to this rule.[9]  This relief, however, is both drastic and permanent it is thus subject to strict statutory conditions.

This Court has summarized the legal framework for evaluating a Section 3582(c)(1)(A) motion:

> In order to modify a sentence and grant compassionate release, a district court must engage in a three-step process. First, it must consider the 18 U.S.C. § 3553(a) factors. Second, the court must find that 'extraordinary and compelling reasons warrant such a

---

[9] Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that— (1) in any case— (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. § 3582(c)(1)(A)(i).

reduction.' *See* 18 U.S.C. § 3582(c)(1)(A). The Sentencing
Commission has determined that "extraordinary and compelling
reasons" to release a defendant from BOP custody include (1)
medical conditions which diminish the ability of the defendant to
provide self-care in prison, (2) age-related deterioration, (3) family
circumstances, and (4) other extraordinary and compelling reasons
that exist either separately or in combination with the previously
described categories. U.S.S.G. § 1B1.13. Third, the Court must
find that 'the defendant is not a danger to the safety of any other
person or to the community, as provided in 18 U.S.C. § 3142(g).'
18 U.S.C. § 3582(c)(1)(A).

*United States v. Esparza,* 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020).

The statute requires that any reduction be "consistent with applicable policy statements

issued by the Sentencing Commission" – in this case, U.S.S.G. § 1B1.13.  *Id.*  As the Supreme

Court recognized in *Dillon*, 560 U.S. at 827, because § 3582(c) permits a sentencing reduction

only where it is "consistent with applicable policy statements issued by the Sentencing

Commission," such policy statements are binding on a court determining eligibility.  U.S.S.G. §

1B1.13 explicitly defines the "extraordinary and compelling reasons" that make a defendant

eligible for compassionate release.[10]

Generalized concerns about possible exposure to COVID-19 alone do not meet the

criteria for extraordinary and compelling reasons for release.  *See United States v. Raia,* 954 F.3d

594, 597 (3d Cir. 2020) ("But the mere existence of COVID-19 in society and the possibility that

---

[10] As it relates to medical condition and age of the defendant, the comment to U.S.S.G. § 1B1.13 provides:
(A) Medical Condition of the Defendant. (i) The defendant is suffering from a terminal illness (i.e., a serious and
advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death
within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral
sclerosis (ALS), end-stage organ disease, and advanced dementia.— (ii) The defendant is— (I) suffering from a
serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III)
experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the
ability of the defendant to provide self-care within the environment of a correctional facility and from which he or
she is not expected to recover.— (B) Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is
experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at
least 10 years or 75 percent of his or her term of imprisonment, whichever is less. *** (D) Other Reasons.—As
determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and
compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).
U.S.S.G. § 1B1.13, cmt. n.1.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 15

it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020).  The Centers for Disease Control (CDC) has identified specific factors that put persons at a high risk for a severe case of COVID-19.[11]

The defendant bears the burden of proving that extraordinary and compelling reasons exist for his release.  18 U.S.C. § 3582(c)(1)(A); *see United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *see generally United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

Even for defendants who are statutorily eligible, compassionate release is a "rare" and "extraordinary" remedy, within district courts' discretion to deny.  *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, 2020 WL 1291835, at *2–*3 (W.D.N.C. Mar. 16, 2020).  This reluctance to expansively apply compassionate release is grounded in a concern that any less narrow application would yield significant sentencing disparities.  *United States v. Ebbers*, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

---

[11] "Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 65 years and older
- People who live in a nursing home or long-term care facility

People of all ages with underlying medical conditions, particularly if not well controlled, including:
- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
  - Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease"

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (emphasis added) (last accessed May 27, 2020).

III.   <u>**ARGUMENT**</u>

In his motion, the Defendant makes an impassioned case that he should be granted compassionate release.  In support, he cites the letters and medical opinions of two doctors – his daughter and close family friend/neighbor – neither of whom have examined or treated him in the last two years.  Conspicuously, these letters and opinions – dated December 2019, February 2020, and early April 2020 – do not reference the Defendant's most recent BOP medical records and lab tests, which show his improved condition.  And while the Defendant mentions the legal criteria of § 3582(c)(1)(A) and USSG § 1B1.13, he only loosely tethers his arguments to the criteria.  No doubt, that is because he knows that a strict application of the criteria to the facts of his case dooms his motion.

None of Defendant's medical conditions are recognized by the CDC as placing him in a "high risk" category for a severe case of COVID-19.  Not surprisingly, all of the 25 cases (but one) the Defendant cites where courts granted compassionate release involve the subject inmate suffering from at least one "high risk" medical condition recognized by the CDC.  Further, Defendant's age alone is not a basis to release him under § 3582(c)(1)(A) and § 1B1.13.  He must show that his physical health has deteriorated because of his age and that he has already served 75 percent of his sentence.  He cannot.  Finally, the Section 3553(a) calculus weighs strongly against his release.  At sentencing, this Court stated that the Defendant's 60-month sentence was the "shortest sentence" it could pronounce and still effectuate Section 3553(a).  Any reduction in that sentence would severely undermine the goals of just punishment and general deterrence.  Accordingly, the Court should deny the Defendant's motion.

A.   <u>**The Court Should Defer Ruling For A Short Time Until BOP Resolves Defendant's Home Detention Request**</u>

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 17

This Court should defer ruling on the instant motion until at least June 30, 2020, the target date for the BOP to release the Defendant to home confinement, if the BOP grants his pending request.  In the interim, the Government has no objection to the Court recommending that the BOP finalize its release plan for the Defendant and make its home confinement decision as expeditiously as possible.  *See United States v. Shabudia,* Case No. 11-cr-00664-JSW-1, 2020 WL 2464751, at *3 (N.D.Ca. May 12, 2020) (in light of BOP finding the defendant eligible for immediate home confinement, the district court agreed with the government that it "should refrain from ordering [defendant's] release based on Section 3582 and should instead allow the BOP to finalize [defendant's] release plan internally"; alternatively, denying defendant's motion for compassionate release under Section 3582).

### B.   The Defendant Has Not Demonstrated An "Extraordinary or Compelling Reason" For Release

Alternatively, if the Court reaches the merits of Defendant's compassionate release motion, it should deny it.  The Defendant has not demonstrated an "extraordinary and compelling reason" for his release under § 3582(c)(1)(A).  Namely, he has not demonstrated a "serious medical condition" that "substantially diminishes" his ability to provide self-care in prison. U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).  Further, he has not demonstrated a "serious deterioration" in his physical health as a result of the aging process or that he has served 75 percent of his prison term.  *Id.* at cmt. n.1(B).  Finally, there is a split in authority over whether a district court may apply the "catchall" provision without input from the Director of the BOP.  *Id.* at cmt. n.1(D). Even if the Court applies the "catchall" provision, the combination of Defendant's age and medical conditions is not extraordinary and compelling; numerous courts have denied compassionate release under far more compelling circumstances.

First, the Defendant has not demonstrated a "serious medical condition" that "substantially diminishes" his ability to provide self-care in prison. *Id.* at cmt. n.1(A)(ii). The Defendant's kidney disease, hypertension, hyperlipidemia, hypothyroidism, anemia, and other conditions are well controlled with medication, diet, and exercise. His medical records demonstrate that his blood pressure, cholesterol, thyroid function, and hemoglobin/herotacrit all are currently are within normal limits. *See* Section I.C., *supra.* By April 2020, his edema had improved and his clinician observed "no swelling in his ankles." *See* Gov't Ex. A at 86. His cough also has subsided. *See id.* at 42, 85-86. Finally, his kidney disease has plateaued at the low end of Stage 3b (close to Stage 3a). *See* Section I.C.2.a., *supra.* Indeed, his kidney function showed minor improvement during his last two lab tests: from January to February, 2020, his GFR increased from 42 to 43 and his Albumin remained within normal limits. *Id.* Simply, the medical opinions of the Defendant's doctors that claim the Defendant suffers from serious, deteriorating, and untreated medical conditions are belied by his BOP medical records.

Significantly, the CDC does not recognize hypertension, hyperlipidemia, hypothyroidism, anemia, edema, or kidney disease (that does not require dialysis) as conditions that place patients at a high risk for a severe case of COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. Instead, the CDC cites other conditions that severely compromise a patient's immune system, cardiovascular system or respiratory system. *Id.* As it relates to kidney disease, the CDC categorizes as high risk only those patients who are "undergoing dialysis" (Stage 5 kidney failure). *Id.* The CDC distinguishes patients with lower stage kidney disease from those undergoing dialysis because dialysis can weaken immune systems, making it harder to fight off viruses like COVID-19. *See* https://www.kidney.org/coronavirus/kidney-disease-covid-19#does-kidney-disease-put-me-higher-risk.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 19

The Defendant is not on dialysis, and all of his other medical conditions are effectively

controlled with medication, diet, and exercise.  Because the CDC does not recognize any of his

conditions as placing him at a high risk for a severe case of COVID-19, the Defendant cannot

demonstrate that he suffers from a "serious medical condition" that "substantially diminishes"

his ability to provide self-care in prison.[12]  His motion fails.

---

[12] *See, e.g., United States v. Bolze*, No. 3:09-CR-93-TAV-CCS-1, 2020 WL 2521273, at *7 (E.D. Tenn.
May 13, 2020) (denying compassionate release motion of 71 year-old defendant with hyperlipidemia, hypertension,
cardiomyopathy, migraine headaches, and Stage 3 kidney disease because "the current medical conditions defendant
lists are being managed by medication in line with CDC recommendations for reducing COVID-19-related risks or
are not among those the CDC has recognized as heightening the risk of severe illness from COVID-19"; Stage 3
kidney disease "is not identified by the CDC as a risk-increasing condition, unless it requires dialysis, which
defendant has not alleged."); *United States v. Hayden*, No. 1:07-CR-68-HAB, 2020 WL 2079293, at *5 (N.D. Ind.
Apr. 30, 2020) (denying compassionate release motion of defendant with Stage 4 kidney disease and auto-immune
disease (lupus); observing that "[a]lthough the CDC has categorically placed persons with chronic kidney disease
who are undergoing dialysis on its list of those especially vulnerable to COVID-19, Defendant is not undergoing
dialysis. . . The COVID-19 risks are less known as it relates to renal failure, with the thought being that it presents
only a slightly increased risk."); *see also United States v. Singh*, 2020 WL 2128588, at *2 (E.D. Cal. May 5, 2020)
(high cholesterol is not a risk factor); *United States v. Gold*, 2020 WL 2197839 (N.D. Ill. May 6, 2020) (defendant is
65, with pre-emphysema, high blood pressure, and high cholesterol, conditions that "are common and do not appear
to be among those the CDC has identified as significant risk factors").

By stark contrast, all of the 25 cases (but one) cited by the Defendant where compassionate release was
granted involved the inmate suffering from at least one of the CDC's "high risk" medical conditions.  *See* Def. Mot.
at 18-20 (citing *United States v. Pomante*, No. 19-20316, 2020 US Dist LEXIS 85626 (E.D. Mich. May 15, 2020)
(diabetes); *United States v. Zukerman*, 2020 US Dist LEXIS 59588 (S.D.N.Y., Apr. 3, 2020) (diabetes, obesity);
*United States v. Etzel*, No. 6:17-cr-00001-AA, 2020 US Dist LEXIS 77198 (D. Or. May 1, 2020) (serious heart
disease); *United States v. Lee*, No. 19-cr-00419-SI-1, 2020 US Dist LEXIS 85931 (N.D. Cal. May 15, 2020)
(asthma); *United States v. Brooks*, No. 07-cr-20047-JES-DGB, 2020 US Dist LEXIS 85671 (C.D. Ill. May 15, 2020)
(obesity, severe asthma); *United States v. Ennis*, No. EP-02-CR-1430-PRM-1, 2020 US Dist LEXIS 84957 (W.D.
Tex. May 14, 2020) (diabetes, asthma); *United States v. Sedge*, No. 16-cr-537(KAM), 2020 US Dist LEXIS 85540
(E.D.N.Y. May 13, 2020) (serious heart disease); *United States v. Robinson*, No. 18-cr-00597-RS-1, 2020 U.S. Dist.
LEXIS 73575, 2020 WL 1982872 (N.D. Cal. Apr. 27, 2020) (immunocompromised); *United States v. Coles*, No. 00-
cr-20051, 2020 U.S. Dist. LEXIS 72327, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020) (diabetes); *United States v.
Bess*, No. 16-cr-156, 2020 U.S. Dist. LEXIS 71056, 2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020) (serious heart
disease, diabetes); *United States v. Trent*, No. 16-CR-00178, (N.D. Cal. April 9, 2020) (HIV/AIDS, diabetes,
obesity); *United States v. Miller*, No. 16-20222-1 (E.D. Mich. April 9, 2020) (serious heart disease, chronic lung
disease, liver cancer, liver disease); *United States v. Gentille*, 19 CR 590, 2020 WL 1814158 (S.D.N.Y. April 9,
2020) (asthma); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732 (D. Conn. April 8, 2020)
(chronic lung disease, asthma); *United States v. Esparza*, No. 1:07-cr-294-BLW, Dkt. No. 124 (Apr. 7, 2020)
(serious heart disease); *United States v. Edwards*, No. 6:17-cr-00003, 2020 WL 1650406 (W.D. Va. Apr. 2, 2020)
(immunocompromised, brain cancer); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020)
(diabetes); *United States v. Williams*, No. 3:04cr95/MCR, 2020 U.S. Dist. LEXIS 63824, 2020 WL 1751545 (N.D.
Fla. Apr. 1, 2020) (serious heart disease, diabetes, end-stage renal disease); *United States v. Jepsen*, 2020 WL
1640232 (D. Conn. Apr. 1, 2020) (immunocompromised, obesity); *United States v. Perez*, No. 1:17-cr-513-AT, Dkt.
No. 98 (S.D.N.Y. Apr. 1, 2020) (government conceded high risk category); *United States v. Gonzalez*, 2020 WL
1536155 (E.D. Wash. Mar. 31, 2020) (chronic obstructive pulmonary disease); *United States v. Doshi*, No. 13-
20349, ECF No. 145 (E.D. Mich. Mar. 31, 2020) (diabetes); *United States v. Muniz*, 09 Cr. 199, 2020 U.S. Dist.
LEXIS 59255, 2020 WL 1540325 (S.D. Texas, March 30, 2020), at *2 (diabetes, end stage renal disease); *United
States v. Campagna*, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (immunocompromised); *but see United*

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 20

Even if the Defendant could demonstrate a qualifying "serious medical condition," his ability to provide self-care is not "substantially diminished" by the COVID-19 pandemic. That is because he is relatively safe at FCI Sheridan. For the entire duration of the pandemic, FCI Sheridan has not reported a single confirmed case of COVID-19. While this Court has observed that "statistics about the number of infections already in BOP facilities are largely meaningless," because testing inside prisons is limited to those inmate that self-report symptoms,[13] zero confirmed cases for the full duration of the pandemic is significant.

COVID-19 is a 14-day disease in most cases. That so many 14-day cycles have come and gone between January 2020 and May 2020 (the duration of the pandemic in the United States), and no one inside FCI Sheridan has exhibited symptoms or tested positive cannot be coincidental. Instead, it is far more likely that BOP's Action Plan – as diligently implemented at FCI Sheridan – has been effective in preventing the introduction of the virus. FCI Sheridan's history of success suggests that the Defendant will remain safe and able to self-care.[14]

---

*States v. Pena,* No. 15-cr-551 (AJN), 2020 WL 2301199 (S.D.N.Y. May 8, 2020) (hypertension and hyperlipdermia, "among other ailments").

[13] *Esparza,* 2020 WL 1696084 at *2

[14] Courts in this and other circuits have recognized that the absence of confirmed cases of COVID-19 is a compelling factor in the self-care calculus. *See United States v. Singui,* Case No. 2:12-CR-00851-CAS-1, 2020 WL 2523114, at *4 (C.D.Ca. May 12, 2020) (denying motion for for inmate with diabetes, high blood pressure, and high cholesterol; observing that "there is little evidence that [the defendant] is presently at greater risk of contracting the virus at MDC than in the general population: MDC has no current reported infections, inmates at MDC are housed in separate units, and the staff at MDC has undertaken a variety of interventions [] to prevent the virus from reaching and spreading within the prison."); *United States v. Hembry,* No. 12-CR-00119-SI-1, 2020 WL 1821930, at *2 (N.D. Cal. Apr. 10, 2020) (denying motion for inmate with diabetes based on COVID-19 risks *inter alia* because the incarcerated movant is "housed at a facility with no reported infections"); *United States v. Shabudia,* Case No. 11-cr-00664-JSW-1, 2020 WL 2464751, at *2 (N.D.Ca. May 12, 2020) (denying motion for elderly inmate with high cholesterol; observing that "while the Court acknowledges [defendant's] worries about the spread of COVID-19 in prisons, the facility in which [defendant] is housed currently has no confirmed cases of COVID-19."); *see also United States v. Wright,* Case No. 17 CR 695 (CM), 2020 WL 1922371, at *3 (S.D.N.Y. Apr. 20, 2020) (denying motion for inmate with diabetes; it appears "the BOP has been successful at limiting the spread of the virus within the MCC. . . despite the close proximity of inmates, the BOP is able to impose restrictions on visitors and restrictions on internal movements that are more difficult to impose outside prison walls. There is no reason to believe at this juncture that [defendant] would be at any less of a risk from contracting COVID-19 if he were to be released."); *United States v. Gamble,* No. 3:18-CR-0022-4(VLB), 2020 WL 1955338, at *5 (D. Conn. Apr. 23, 2020) ("To date, 24 inmates out of 153,776 or .015% (i.e. 1.5 per 10,000) of the population held in Bureau of Prison managed facilities or community-based facilities died from COVID-19 and 540 or .35% have become infected. . .

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 21

And while the Defendant is free to speculate that it is inevitable that COVID-19 eventually will penetrate FCI Sheridan,[15] it is equally plausible that an immunization will materialize before it does. On May 18, 2020, Moderna announced that its Phase 1 clinical trials for its vaccine candidate prompted an immune response in the human subjects and was well tolerated by them. *See* https://www.nbcnews.com/health/health-news/moderna-s-covid-19-vaccine-shows-positive-results-moves-larger-n1209161. Based on the success of this and other trials, and because the federal government has taken the unprecedented step of beginning production on promising vaccine candidates before testing is complete, Dr. Anthony Fauci is cautiously optimistic that millions of doses of a COVID-19 vaccine can be distributed by the end of 2020. *See* https://thehill.com/homenews/administration/499219-the-hill-interview-fauci-on-why-a-vaccine-by-end-of-year-is.

Likewise, the Defendant cannot demonstrate a "serious deterioration" in his physical health as a result of the aging process or that he has served 75 percent of his prison term. U.S.S.G. § 1B1.13, cmt. n.1(B). As set forth above, his kidney function showed minor improvement during his last two lab tests in and he has plateaued at low Stage 3b. His other conditions have either subsided (edema, anemia, cough) or test within normal limits (hypertension, hyperlipidemia, hypothyroidism, BPH, low testosterone). It is not in dispute that the Defendant has served only about 22 months of his 60-month sentence, approximately 36 percent. Thus, the Defendant cannot satisfy the criteria of comment note 1(B). *Id.*

---

By comparison, the state of Connecticut has had 22,469 laboratory confirmed COVID-19 positive infections and 1,544 deaths. . . Consequently, Connecticut's infection rate is 71% higher than the BOP's and its death rate is close to double the BOP's by population."); *United States v. Seng*, 2020 WL 2301202, at *6-7 (S.D.N.Y. May 8, 2020) ("statistics support the inference that Ng would be more at risk of contracting COVID-19 where he released and required to stay in his apartment in Manhattan than he would be by remaining in FCI Allenwood Low," which had no cases); *United States v. Guyton*, 2020 WL 2128579 (E.D. La. May 5, 2020) (45-year-old with mild hypertension; no cases at facility); *United States v. Shah*, 2020 WL 1934930 (E.D. Mich. Apr. 22, 2020) (defendant with diabetes and hypertension, but no cases at his facility, and BOP is making efforts to protect inmates).

[15] *See* Def. Mot at 10-14.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 22

Finally, the "catchall" provision of Subdivision 1(D) does not provide the Defendant a basis for his release.  U.S.S.G. § 1B1.13, cmt. n.1(D).  By its explicit terms, the discretion under this "catchall" provision is limited to the Director of the BOP, not the courts.  *Id.* at cmt. n.1(D) ("As determined by the Director of the Bureau of Prisons . . .").  There is "a split in authority about whether a district court may apply Subdivision D without input from the Director of the BOP."  *United States v. Chan*, No. 96-CR-00094-JSW-13, 2020 WL 1527895, at *4 (N.D. Cal. Mar. 31, 2020) (citing cases).[16]

Even if this Court were to apply the "catchall" provision, the Defendant has not demonstrated that the combination of his age and medical conditions is extraordinary and compelling.  Indeed, courts have denied compassionate release to inmates whose constellation of age and medical conditions put them at far greater risk for contracting a severe case of COVID-19 than the Defendant.[17]  In sum, there are no "extraordinary and compelling" reasons for Defendant's release.

### C.   The Defendant Has Not Demonstrated That Section 3553(a) Factors Support His Release

#### 1.   Just Punishment

---

[16] *See also Bolze*, 2020 WL 2521273, at *7 ("only the 'Director of the Bureau of Prisons' can determine that such 'other reasons' exist); *United States v. Girod*, No. 5:15-87, 2020 WL 1931242, at *2 (E.D. Ky. Apr. 21, 2020) ("By its plain language, Application Note 1(D)'s 'other reasons' determination is reserved for the Director of the BOP."); *United States v. Mollica*, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020) ("Multiple district courts within this Circuit that have addressed the issue have found that the policy statement, as written, remains in effect until the Sentencing Commission sees fit to change it; therefore, relief under Subsection D requires a finding from the BOP that the inmate has extraordinary circumstances that merit relief outside of those circumstances specifically enumerated in the policy.").

[17] *See, e.g., United States v. Gill,* 2020 WL 2084810 (E.D. Cal. Apr. 30, 2020) (61 year-old; cirrhosis resulting in multiple hospitalizations for hepatic encephalopathy, depression, anemia, esophageal reflux, lower back pain, hyperlipidemia, polyneuropathy, Type II diabetes); *United States v. Mangarella*, No. 306CR151FDWDCK3, 2020 WL 1291835, at *3 (W.D.N.C. Mar. 16, 2020) (chronic emphysema Level II, BPH, Chronic Obstructive Pulmonary Disease (COPD), polyneuropathy in diabetes, vertigo); *United States v. Godofsky*, 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (63 year-old; high blood pressure, high cholesterol, asthma, and taking immunosuppressant medication; "even in the context of the ongoing public health crisis," this does not present an extraordinary or compelling circumstance); *United States v. Condon*, 2020 WL 2115807 (D.N.D. May 4, 2020) (61 year-old; asthma, COPD, cardiovascular disease, hepatitis C, hypertension, and hidradenitis suppurativa (an auto-immune disorder)); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020) (71 year-old; diabetes, high blood pressure, obesity, respiratory issues, metabolic syndrome).

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 23

At sentencing, the probation officer calculated the total offense level at 36, and a criminal history category I.  PSIR at ¶ 155.  According to the probation officer, the recommended guideline range was 188 to 235 months.  *Id.*  The Government recommended a sentence of no less than 180 months.  Gov't Sent. Memo at 1 (ECF #682, Aug. 13, 2014).  The probation officer recommended a sentence of 144 months.  *See* Sent. Rec. at 3 (ECF #677, filed Aug. 13, 2014).

The Court departed substantially from the guideline range – and well below the recommendations of the probation officer and the Government – and sentenced the Defendant to 60 months in prison.  See Gov't Ex. B at 74 (Ellison Sent. Tr., Aug. 20, 2014).  The Court was moved by the many letters of support from family, friends, fellow parishioners, members of the bar, and retired justices, and the otherwise aberrant nature of the Defendant's crime.  *Id.* at 68-73.  The Court stated that it "felt a great deal of sympathy" for the Defendant.  *Id.* at 78.  It described the sentence "shortest sentence that I could pronounce and still effectuate the objectives of 3553(a)(2)."  *Id.* at 73.

Simply put, the Defendant has already benefitted extraordinarily from the Court's leniency.  Reducing his 60-month sentence – to a 22-month "time served" sentence – would severely undermine the goal of just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).  As this Court recognized, the Defendant is held to a higher standard:

> As a lawyer, Mr. Ellison is held to a higher standard because others rely upon him to ensure that things were done properly. Even people such as Gary Bringhurst, David Swenson, Jeremy Swenson, and even Doug Swenson may have been influenced by the notion that if general counsel has approved this, then nothing more need be done.

Gov't Ex. B at 67.  Even if he answered to CEO Douglas Swenson, many others followed his lead, including his protégé and National Sales Director, Merriah Harkins.  But he actively misled her when she probed, over and over again, for the truth.  And it was the investment disclosure

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 24

materials that he approved and disseminated that were the vehicle of the fraud.  This conduct from a lawyer does not warrant a time served 22-month sentence.

While the Defendant may have behaved admirably during his release pending appeal and in prison, he has continued to fail his victims.  Though Defendant agreed to a consent order of forfeiture and to a civil settlement with the DBSI bankruptcy trustee prior to sentencing – when it was in his interest to do so, as he invoked these deeds to argue for a lenient sentence – his voluntary payments ceased once this Court sentenced him.  During the approximate four years the Defendant remained free pending appeal, and during his 22 months in prison, the Defendant has not made a single voluntary restitution payment.  Gov't Ex. D at 174.  Since he was sentenced, he has paid only $264.68, which reflects only mandatory $25 monthly payments deducted from his prison account and one Treasury Offset Program offset of $89.68.  The Court should consider this in evaluating the Defendant's claim that his "release would also benefit the victims of the financial harms that formed the basis for his conviction."  Def. Mot. at 25.[18]

### 2.    General Deterrence

Moreover, the effect on general deterrence from reducing Defendant's sentence to a time-served 22 months, in this most high-profile of cases in Idaho, would be nothing short of devastating.  Back in 2014, this Court acknowledged the deterrent effect of lengthy prison sentences for white collar criminals, and cited Matt Duckett's interaction with the Defendant as proof:

> Is there any deterrent effect resulting from prison sentences, particularly long prison sentences?  But there is an assumption, and one which I think is valid, that there is a substantial deterrent effect in white-collar criminal cases because they are more rational, deliberate, purposeful, nonimpulsive, and calculated.  And, in fact, there is some evidence of that in this case.  I think it was Matt

---

[18] Not surprisingly, the unpaid victims vehemently object to the Defendant's compassionate release.  *See* Gov't Ex. E.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 25

> Duckett who provided Mr. Ellison with several copies of news articles about people going to prison for committing fraud and suggesting 'This is what will happen if we don't make these changes.' I think that is some indication that, indeed, that in the boardrooms of America and on the -- that there are decisions made that are impacted by whether people go to prison or not when there is fraudulent conduct. In a high-profile case like this one, I think the message given by the court's sentence, whether that sentence is short or long, I think is probably magnified in terms of its deterrent effect.

Gov't Ex. C at 55-56 (Doug Swenson Sent. Tr. Aug. 20, 2014); *see also* Gov't Ex. B at 70 ("So I am absolutely convinced that if there is a case that's appropriate to try to have a deterrent effect, it's in this type of case.").

Should the Court release the Defendant after serving only 22 months of his sentence, would-be white collar criminals will not scrutinize why. Instead, they will assume that the Defendant – a wealthy white male with two sets of high-powered attorneys in Washington, D.C. and Idaho – simply bought his way out of jail. These would-be criminals would draw the conclusions that the dissenters in *United States v. Edwards*, 622 F.3d 1215 (9th Cir. 2010) feared they would: that the Defendant, because of his shared socio-economic status with the Court and talented legal team, made "a persuasive presentation to the district court that he was an unhealthy, aging retiree repentant of past frauds," and "was uniquely positioned to elicit empathy from [the] sentencing court" that resulted in his reduced sentence. *Id.* at 1216-17. Accordingly, Section 3553(a) strongly militates in favor of denying Defendant's motion.[19]

## Conclusion

For the reasons set forth above, the Court should defer ruling on Defendant's motion until at least June 30, 2020. Alternatively, the Court should deny Defendant's motion.

---

[19] The Government concedes that, under 18 U.S.C. § 3142(g), that the Defendant, if released, will not pose a danger to the community and that he is unlikely to recidivate.

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 26

Respectfully submitted this 27th day of May, 2020.

BART M. DAVIS
United States Attorney
By:


*/s/ Raymond E. Patricco*
Raymond E. Patricco
Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 27, 2020, the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| David Nevin, Esq.<br>Nevin, Benjamin, McKay & Bartlett LLP<br>303 West Bannock<br>P.O. Box 2772<br>Boise, ID. 83701<br>dnevin@nbmlaw.com | ☐ United States Mail,<br>☐ Fax<br>☒ ECF filing<br>☐ E-mail |

*/s/ Raymond E. Patricco*
Assistant United States Attorney

RESPONSE TO MOTION FOR COMPASSIONATE RELEASE - 28